## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: BL SANTA FE, LLC, *et al*., | : | Chapter 11 |
| | : | Case No. 21-11190 (MFW) |
| Reorganized Debtors. | : | (Jointly Administered) |
| _____ | : | |
| REORGANIZED DEBTOR BL SANTA FE, LLC, | : | |
| | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civ. No. 24-1077-JLH |
| REALTY FINANCIAL RESOURCES, INC., | : | |
| | : | |
| Appellee. | : | |

Gregory A. Taylor, Ashby & Geddes, P.A., Wilmington, DE; Steve D. Jerome, Emily Gildar, Yaron, Molly J. Kjartanson, Snell & Wilmer LLP, Phoenix, AZ,

    *Counsel for Appellant, Reorganized Debtor BL Santa Fe, LLC.*

William E. Chipman, Jr., Chipman Brown Cicero & Cole, LLP, Wilmington, DE; Adam D. Cole, Chipman Brown Cicero & Cole, LLP, New York, NY,

    *Counsel for Appellee, Realty Financial Resources, Inc.*

## **<u>OPINION</u>**

October 31, 2025

HALL, U.S. DISTRICT JUDGE

## I.    INTRODUCTION

This appeal arises from the chapter 11 cases of BL Santa Fe, LLC ("BLSF") and BL Santa Fe (Mezz), LLC ("Mezz," and together with BLSF, the "Debtors") in connection with the allowance of two general unsecured proofs of claim—Claim Nos. 12 and 20 ("Claims")—filed by appellee Realty Financial Resources, LLC ("RFR")—based on agreements between the Debtors and RFR under which RFR was retained to help BLSF solicit and negotiate financing.  Appellant, the Reorganized Debtor BL Santa Fe, LLC ("Reorganized Debtor") objected to the Claims.  The Reorganized Debtor did not contest that RFR was retained by the Debtors to obtain financing but disputes that it is entitled to the fees requested.  Following a two-day evidentiary hearing, the Bankruptcy Court issued an order, dated September 12, 2024 ("Order") overruling the Reorganized Debtor's objections, and allowing both Claims (Bankr. D.I. 317)[1] ("Order"), for the reasons set forth in its accompanying opinion, *In re BL Santa Fe, LLC*, 2024 WL 4174388 (Bankr. D. Del. Sept. 12, 2024) ("Opinion").  The Reorganized Debtor asserts that it is not liable to RFR for either of the Claims, as RFR failed to carry its burden of establishing its right to payment by a preponderance of the evidence.  As explained below, the Order will be affirmed.

## II.    BACKGROUND

### A.    Procedural Background

The factual background relevant to this dispute is set forth in detail in the Bankruptcy Court's Opinion.  *In re BL Santa Fe, LLC*, 2024 WL 4174388, at *1.  On August 30, 2021 ("Petition Date") BLSF (predecessor to the Reorganized Debtor) and its affiliate Mezz filed petitions under chapter 11

---

[1] The docket of the chapter 11 cases, captioned *In re BL Santa Fe, LLC*, No. 21-11190 (MFW) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."

of the Bankruptcy Code. (APPX.002407.)[2]  BLSF owned Bishop's Lodge, a luxury resort located in Santa Fe, New Mexico ("Resort").  (APPX.000103–04 at 19:24–20:8.)  The bankruptcy filing was precipitated by financial difficulties, delays, and cost overruns affecting the renovation of the Resort. As of the Petition Date, the senior lender, Fortress Credit Co, LLC ("Fortress") was owed $40,979,543.53 million and the mezzanine loan lender, Juniper Bishops, LLC ("Juniper"), was owed $33,594,752.40.  On the Petition Date, the Debtors filed a pre-packaged Plan of Reorganization[3] that had been accepted by Fortress and Juniper, and which provided for the amendment of Fortress' debt and the conversion of Juniper's debt to 100% of the equity in BLSF.  (*See* APPX.000367–479.)  On October 21, 2021, the Bankruptcy Court confirmed the Plan, as revised, which went effective immediately.  (APPX.000480–568.)

RFR filed two proofs of claim in the case: Claim No. 12 (APPX.000570–575), which asserts a claim of $175,000 for unpaid fees for its work relating to the financing of the Resort by Fortress and Juniper in 2019, and Claim No. 20 (APPX.000709–802), which asserts a claim of $745,742.96 for fees related to the refinancing of the Juniper and Fortress secured debt in the confirmed Plan.  On January 30, 2023, the Reorganized Debtor filed an Objection to Claim Nos. 12 and 20. (APPX.000576–708.) On June 16, 2023, RFR filed its response.  (APPX.000803–832.)  On June 30, 2023, the Reorganized Debtor filed its reply.  (APPX.000833–957.)  On December 12 and 13, 2023, the Bankruptcy Court conducted an evidentiary hearing on the Objection to the Claims.  (*See* APPX.000085–238 (12/12/24 Tr.) and APPX.000239–345 (12/13/24 Tr.).)  After the trial, RFR (APPX.000966–2127) and the Reorganized Debtor (APPX.002128–2406) each filed post-trial

---

[2] The appendix (D.I. 21) to Reorganized Debtor's opening brief is cited herein as "APPX.___," and the appendix (D.I. 25) to RFR's answering brief is cited herein as "A.___."

[3] The Plan was revised on October 14, 2021, without changing the treatment of Fortress or Juniper.  (*See* APPX. 002408.)

closing briefs.  On September 12, 2024, the Bankruptcy Court issued its Order and Opinion overruling the Objections to RFR's Claims.  On September 26, 2024, the Reorganized Debtor filed a timely notice of appeal.  (D.I. 1.)  On May 2, 2025, the appeals were fully briefed.  (D.I. 20, 24, 26, 27.)  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

### B.    Factual Background

#### 1.    Facts Relevant to Claim No. 12

Prior to 2019, BLSF retained RFR to assist in soliciting and negotiating financing to renovate the Resort.  RFR's efforts led to Fortress lending $43,000,000 to BLFS on or about June 14, 2019 ("Senior Loan").  (APPX.000804 ¶ 2.)  RFR's efforts also led to Juniper lending $15,000,000 to Mezz. on the same date ("Mezzanine Loan").  (*Id*.; APPX.000320 at 82:1–12.)

Under the parties' agreement, RFR earned a success fee of 1% of the Senior Loan amount and 3% of the Mezzanine Loan amount.  (APPX.000105–06 at 22:18–23:9; APPX.000320 at 82:14–25.)  On June 6, 2019, RFR issued an "invoice" to BLSF for $880,000.  (A.000001; APPX.000112–116 at 29:23–32:8.)  The Invoice reflected the $730,000 to be paid at closing and $150,000 to be "deferred," which the Invoice provided "will be secured by note in favor of Realty Financial Resources, Inc." (A.000001.)  Consistent with the Invoice, $730,000 was paid to RFR, as referenced in a closing cash Disbursement Statement.  (APPX.001738.)  An email from Richard Holland ("Holland"), BLSF's Manager at the time, confirmed the $730,000 paid was only a "portion" of the fee and the deferred amount would be evidenced by a "Note." (A.000002; APPX.000327–30 at 91:19–92:6.)  The amount was recorded on BLSF's general ledger as payable to RFR.  (A.000038; APPX.000808 ¶ 19.)

Two days later, on June 15, 2019, BLSF and RFR purportedly entered into a promissory note in the principal amount of $150,000.00 ("Promissory Note").  (APPX.000958–961.)  RFR did not

attach the original Promissory Note to Claim No. 12 but provided a copy, which is marked with a "draft" legend and dated June 13, 2019 in the upper right-hand corner.  (*Id.*)

On June 15, 2020, Mr. Holland, on behalf of BLSF, entered into a modification to the Promissory Note with RFR ("Note Modification").  (APPX.000962–963.)  Mr. Holland signed the Note Modification as BLSF's Manager, and George David signed the Note Modification as RFR's Co-President.  (APPX.000963.)  The Note Modification states that "[o]n June 15, 2019, BL Santa Fe, LLC … executed and delivered a Promissory Note to Realty Financial Resources, Inc. … promising to pay ONE-HUNDRED FIFTY THOUSAND AND 00/100 Dollars ($150,000.00) on the fifteenth (15th) day of June, 2020." (APPX.000962.)  The Note Modification extended the payment date to June 15, 2021 and provided for alternative "Extension Fees": (i) $20,000 if the balance was paid by March 31, 2021, or (ii) $25,000 if the balance was paid by May 31, 2021.  (APPX.000962–963.)

In addition to the Extension Fees, the Modification Agreement states that BLSF purportedly agreed to enter an agreement with RFR "by August 1, 2020, or any entity to which [RFR] agrees to assign the Agreement, granting [RFR] the exclusive right to re-capitalize all debt … associated with the project ("Project") in Santa Fe, New Mexico presently described as _____, on the terms and conditions set forth in the Agreement."  (*Id.*)  Although the Modification Agreement references an "Agreement," the Modification Agreement does not attach any agreement.  (*Id.*)  The Modification Agreement further states that: "In the event that the Project is sold, or additional capital for the Project is raised, or the Project is refinanced in full prior to June 15, 2021, the Note will be paid in full, including extension fees, accrued interest and any other penalties due to non-compliance with the [Promissory] Note."  (*Id.*)

RFR subsequently offered evidence in support of its contention that, in the Fall of 2020, RFR moved its headquarters from California to Florida (APPX.000806 ¶ 10), and that during that move, the original Promissory Note was lost, with the only remaining version being a digitally maintained

copy which was authenticated at trial by Mr. Holland—the signatory to the Promissory Note on BLSF's behalf.  (APPX.000097 at 13:4–18.)

### 2.    Facts Relevant to Claim No. 20

In mid-2020, as the COVID pandemic disrupted supply chains, the Senior Loan and Mezzanine Loan became out of balance and BLSF risked being unable to complete the Resort. (APPX.000191–192 at 107:17–108:17; APPX.000136 at 52:5–20.) At BLSF's behest, Greg Pitts, RFR's other Co-President, contacted Fortress and Juniper—through their managing partner, Jay Wolf—on multiple occasions to determine whether either would refinance their loans.  (APPX.000202 at 118:4–24; *see* A.000062.)  Neither was interested, and both repeatedly demanded to be "repaid in full." (*Id*.; APPX.000205–06 at 121:23–122:21; APPX.000222 at 138:7–14.)

On December 1, 2020, BLSF and RFR entered into a "Proposal for Financial Advisory Services for the Refinancing of Bishops Lodge Resort, Santa Fe, New Mexico," dated December 1, 2020 ("Letter Agreement").  (APPX.000346.)  Under the Letter Agreement, RFR agreed to assist BLSF, "on an exclusive basis," to secure commitments for "Financing" to refinance or recapitalize the Senior Loan and Mezzanine Loan, defined in the Letter Agreement as "Financing Commitments." (*Id*.) The Letter Agreement defined "Financing" broadly as:

> Equity or debt, in whatever form, provided in any single transaction or a combination of transactions, including, but not limited to equity, secured or unsecured loans, secondary or subordinate financing, guarantees or other credit enhancements, mezzanine financing, bridge loans, lease or lease financing, or any other vehicle by which borrowed money or credit is raised.

(*Id*.) The Letter Agreement entitled RFR to a fee of "one percent (1.0%) of any and all Financing raised as senior debt, mezzanine or junior debt, and/or equity" ("Success Fee") if BLSF executed a Financing Commitment that arose out of a "Financing Offer." (*Id*.)  Mr. Holland signed the Letter Agreement as BLSF's "Manager." (A.000053–54 ¶22; A.000048.)

The Letter Agreement provided for a six-month term to June 1, 2021. (APPX.000346.) The term would be automatically extended for as long as RFR and BLSF "continue[d] negotiations for Financing with bona-fide Investors," and until RFR and BLSF "approve[d] a termination date … when negotiations have been concluded." (*Id*.) Should the Letter Agreement be terminated upon agreement of the parties, RFR was to furnish BLSF with a "list setting forth the names of all parties with whom RFR has had substantive discussions for Financing" ("Prospects List"); RFR would be entitled to a Success Fee if BLSF accepted a Financing Offer from a Prospects List party in the ensuing twelve months. (APPX.000347–48.)

RFR's job under the Letter Agreement was to generate as many offers as possible, "create competition" among potential refinancing sources, assist in negotiating with potential sources, and provide options to enable BLSF to obtain the best offer possible. (APPX.000205 at 121:6–22; APPX.000253–54 at 15:9–16:19.) RFR immediately launched efforts to market a potential "Financing" including (i) preparing an information package that included photographs, renovation information, updated financial projections and sales comparables, (ii) preparing target investor lists, and (iii) sharing information and arranging telephone calls with prospective investors. (APPX.000203–04 at 119:11–120:11.) Mr. Pitts testified that RFR had substantive discussions with at least thirty interested parties, eight of which expressed interest. (APPX.000204–07 at 120:18–121:5, 122:22–123:24.)

One group of potential investors was led by Andrew Blank and Gerald Peters ("Blank Group"). (APPX.000207 at 123:12–24; *see* APPX.000140–41 at 56:7–57:14.) RFR introduced the Blank Group to BLSF. (APPX.000212 at 129:9–23.) By mid-January 2021, the Blank Group submitted a refinancing proposal to BLSF through RFR, which RFR then worked to improve. (APPX.000244–46 at 6:16–8:5; A.000064–65.)

Within weeks of the Blank Group submitting the proposal RFR originated, Juniper shifted course and, rather than demand repayment, on February 9, 2021, proposed its own term sheet to become an equity investor (APPX.000350–361) ("Initial Term Sheet").  At trial, Mr. Wolf testified that Juniper was not contacted by RFR to remit the Initial Term Sheet (APPX.000142 at 58:9–15) and that Juniper did not have direct communications with RFR about the Initial Term Sheet.  (*See* APPX.000142 at 58:9–1; APPX.000286 at 48:9–24.)

Subsequently, RFR, through Mr. Pitts, participated in a direct telephone call with Juniper to "talk through the details of that term sheet," and, on February 10, 2021, RFR analyzed and provided comments on Juniper's proposal and prepared a response for BLSF consistent with RFR's role under the Letter Agreement.   (APPX.000207–209 at 123:25–125:23; APPX.000218 at 134:6–10; APPX.000627–700; A.000066.)   One week later, on February 16, 2021, BLSF and Juniper signed a formal, non-binding, term sheet in competition with the Blank Group's proposal.  (APPX.000350.)

Thereafter, RFR and BLSF worked to improve the competing proposals.  By early March 2021, the Blank Group submitted a new proposal through RFR that was described by BLSF's management as offering "better terms than any other term sheet that we have received by anyone." (A.000067–68.)  BLSF's management confirmed (i) Juniper was aware of the proposal, (ii) Juniper's term sheet was not exclusive, (iii) Juniper—through Mr. Wolf—had encouraged BLSF to continue soliciting competing proposals to avoid Juniper being viewed as a predatory lender, and (iv) BLSF's management considered the Blank and Juniper proposals as competing.   (A.000067–72; APPX.000249–253 at 11:10–15:6.)

RFR continued its efforts to improve the potential financing, and, on April 3, 2021, the Blank Group and BLSF entered a new non-binding term sheet which would have resulted in the Blank Group owning 100% of BLSF's equity and the Fortress and Juniper Loans being repaid in full.

(APPX.000362; APPX.000216 at 132:3–22.)  Juniper responded with an updated, non-binding, term sheet on April 5, 2021, in which it also sought to own 100% of BLSF's equity.  (APPX.000582 ¶ 23.)

RFR continued its efforts to solicit and negotiate "Financing" and Juniper continued to negotiate with BLSF and the Blank Group past the Letter Agreement's June 1, 2021 term date and through the August 30, 2021 date on which BLSF and Mezz. filed their bankruptcy cases. (APPX.000218–222 at 134:11–138:18; APPX.000185–86 at 101:18–102:8; APPX.000582 ¶ 28; A.000083–87 at 11:6–15:6.)  Indeed, as late as the plan confirmation hearing, the Blank Group promoted an alternative transaction to recapitalize the Fortress and Juniper Loans. (APPX.0001333–36 at 11:24–14:13; APPX.1351–54 at 29:25–32:6; APPX.000185–186 at 101:18–102:8; A.000165 at 93:16–97:5; A.000171 at 99:21–101:11, 105:1–9.)

At trial, Mr. Wolf, on behalf of Juniper, testified that the Blank Proposal, which RFR pushed, did not benefit the Debtors but harmed them by pushing them into bankruptcy, which cost "$5 million in professional fees and expenses, millions of dollars of performance impact from the hotel being in bankruptcy."  (APPX.000150 at 66:12–21.)  Mr. Wolf further testified that RFR performed no work that "add[ed] value" to the Debtors.  (APPX.000188–189 at 104:22–105:12.)  Mr. Wolf further testified that, in his view, RFR's actions in seeking a Success Fee from the Reorganized Debtor, when RFR caused so much economic and reputational damage to the Debtors, was "outrageous and repugnant."  (APPX.000182–183 at 98:17–19.)

On August 29, 2021, BLSF, Juniper, and Fortress, among others, entered into a Restructuring Support Agreement with attached Restructuring Term Sheet ("Restructuring Term Sheet"). (APPX.000033.)  On August 30, 2021, BLSF and Mezz filed their bankruptcy cases with the prepackaged plan through which the Restructuring Term Sheet would be implemented.  On October 14, 2021, the Debtors filed the revised plan also under which the Restructuring Term Sheet would be implemented.  (APPX.000367; APPX.000396 at Art. III § G;  APPX.000398 at Art. IV § G;

APPX.000400 at Art. IV § K.)  Under the Plan, Fortress's Senior Loan claim was allowed in full and then "payment" in full was made "in accordance with the Amended and Restated Senior Loan Documents" to which Fortress agreed.  (APPX.000391 at Art. III, § B(a)(ii) & (iii).)  Juniper's Mezzanine Loan was also allowed in full and then satisfied with 100% of the equity interests in the Reorganized Debtor being conveyed to a Juniper subsidiary ("JBL Holdco").  (APPX.000394 at Art. III, § B(f)(iii); *see* APPX.000579 ¶ 7.)  Juniper also agreed to contribute additional cash ("Additional Cash Contribution").  (APPX.000397 at Art. IV, § B(2).)

On October 17, 2021, RFR filed an initial $600,000 proof of claim in the Debtors' bankruptcy cases based on amounts it believed was owed under the Letter Agreement.  On October 28, 2021, one week after Plan confirmation, the Reorganized Debtor's then President, Michael Norvet, delivered a letter to RFR attempting to confirm that the Letter Agreement had been terminated five months before, on June 1, 2021.  (APPX.000569.)

On October 21, 2021, the Bankruptcy Court confirmed the Plan, Fortress was later paid in full, and JBL Holdco became the 100% owner of the Reorganized Debtor thereby satisfying Juniper's Mezzanine Loan.  (APPX.000480.)

On October 29, 2021, Mr. Pitts responded to Mr. Norvet's letter (i) stating there had been no termination, (ii) confirming negotiations had continued well-beyond June 1, 2021, and (iii) attaching RFR's Prospect List of the parties with which it had engaged—including Juniper and Fortress.  (APPX001942–46.)  BLSF has not challenged the accuracy of the Prospect List.

At trial, the Reorganized Debtor offered no other document to support the June 1, 2021 termination or a witness with first-hand knowledge of the purported June 1, 2021 termination.

### C.    The Trial and the Order

On December 12 and 13, 2023, the Bankruptcy Court conducted a bench trial on the Objection to RFR's Claims and admitted 26 exhibits into evidence.  Mr. Pitts, Mr. Holland, and Mr. Wolf

testified, enabling the Bankruptcy Court to evaluate their credibility.  Other than Mr. Holland, no member of the pre-bankruptcy BLSF management team testified.

The Bankruptcy Court overruled the Reorganized Debtor's objections to Claim No. 12 because (i) after crediting the testimony of Mr. Pitts and Mr. Holland over Mr. Wolf's testimony and based upon corroborative documentary evidence, RFR had established the Claim's validity, and (ii) RFR satisfied its factual burden under the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and the Uniform Commercial Code ("UCC") to establish the validity of the Reorganized Debtor's liability under the Promissory Note and Note Modification despite the original note having been lost.  *See In re BL Santa Fe*, 2024 WL 4174388, at *2–7.

The Bankruptcy Court also overruled the Reorganized Debtor's objections to Claim No. 20 because, after crediting Mr. Pitts' trial testimony and transcript testimony of others over Mr. Wolf's testimony, as well as corroborative documentary evidence, RFR met its burden to show (i) the Reorganized Debtor's attempt to terminate the Letter Agreement five months after the fact was "ineffective" because negotiations continued after June 1, 2021, and, even if it had been effective, the Reorganized Debtor remained obligated to pay RFR its Success Fee under the Letter Agreement's twelve-month "tail," (ii) the Plan under which the Fortress loan was paid and Juniper refinanced its outstanding loan in exchange for 100% of the Reorganized Debtor's equity constituted a "Financing" under the Letter Agreement, and (iii) RFR's efforts at soliciting a Financing that led to the Restructuring Term Sheet and confirmed Plan entitled it to its Success Fee.  *See id*. at *7–14.

## III.    JURISDICTION AND APPLICABLE STANDARDS

District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees."  28 U.S.C. § 158(a)(1).  "An order allowing or disallowing a claim is a final, appealable order."  *In re Prosser*, 388 F. App'x 101, 102 n.1 (3d Cir. 2010) (quoting *Orsini Santos v. Mender*, 349 B.R. 762, 768 (1st Cir. BAP 2006)).  With respect to whether the Claims were properly allowed,

the Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 570 (D. Del. 2018).

The Reorganized Debtor objected to the Claims under Section 502(b)(1) of the Bankruptcy Code, which provides that a court will disallow a claim to the extent it is unenforceable under applicable law. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 245 n.66 (3d Cir. 2004). As the Bankruptcy Court explained, the burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Initially, the claim holder must establish the prima facie validity of the claim. Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure (*i.e.*, includes the facts and documents necessary to support the claim), constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Samson Res. Corp.*, 569 B.R. 605, 615 (Bankr. D. Del. 2017); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del. 2016) ("Because a properly filed proof of claim is treated not merely as a document containing arguments and assertions, but as evidence that sufficiently supports its claims, a proof of claim that is filed 'in accordance' with Bankruptcy Rule 3001 serves to satisfy the claimant's initial burden of production."). The claim objector must then produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Allegheny*, 954 F.2d at 173. At that point, the burden shifts back to the claim holder to provide the validity of the claim by a preponderance of the evidence. *Id*. at 174. The ultimate burden of persuasion rests on the claim holder. *In re Samson Res.*, 569 B.R. at 615.

## IV.   ANALYSIS

### A.   The Bankruptcy Court Did Not Err in Allowing Claim No. 12

The Bankruptcy Court concluded that "RFR has presented sufficient and credible evidence satisfying its burden of proving the validity of Claim No. 12." *In re BL Santa Fe*, 2024 WL 4174388,

11

at *7.  The Reorganized Debtor's main arguments on appeal are as follows: (1) RFR failed to produce the original Promissory Note; and (2) RFR failed to meet its burden under Bankruptcy Rule 3001(c)(1) and N.M. Stat. Ann. § 55-3-309.

> ### 1.    The Bankruptcy Court Did Not Err in Concluding that RFR Met its Burden of Establishing its Right to Payment Under the Promissory Note

Pursuant to Claim No. 12, RFR sought $175,000 under the Promissory Note and Note Modification.  Claim No. 12 is based on the retention of RFR by the Debtors, prior to 2019, to obtain capital or financing for the Debtors to renovate the Resort.  Because the Debtors did obtain financing in 2019 from Fortress and Juniper, RFR asserts it earned a fee of $880,000, of which $175,000 remains unpaid as represented by the Promissory Note and Note Modification.  Claim No. 12 attached a copy of the Note Modification only.  RFR later submitted a digital copy of the alleged Promissory Note. (APPX.000958–961).

The Reorganized Debtor argues that Claim No. 12 must be disallowed because RFR failed to attach the original Promissory Note, the writing upon which its claim is based.  According to the Reorganized Debtor, "[f]rom the face of the purported Promissory Note, it is not clear who executed the Promissory Note, or even if the Promissory Note was actually executed, or when the Promissory Note was executed. In fact, the Promissory Note contains a 'draft' legend dated June 13, 2019, in the upper right-hand corner and contains entirely illegible marks on the signature lines."  (D.I. 20 at 38–39.)  The Reorganized Debtor thus contends that RFR has not satisfied its burden of proof under Bankruptcy Rule 3001(c)(1)[4] and Section 55-3-309 of the New Mexico Code.[5]

---

[4] Rule 3001 provides that a creditor whose claim is based on a writing must attach it to the proof of claim, but if it is lost or destroyed, a statement of the circumstances surrounding the loss should be attached to the proof of claim.  Fed. R. Bankr. P. 3001(c)(1).

[5] Section 3-309(a) of the UCC provides a standard for proving a claim when the negotiable instrument on which it is based is not available.  The parties cite the Delaware, California, and New Mexico versions of the UCC.  *See* N.M. Stat. Ann. § 55-3-309; Del. Code Ann. tit. 6, § 3-309(a); Cal.

RFR offered testimony that the original Promissory Note was lost when RFR moved its offices. (APPX.000097 at 13:4–9.) The mere fact that the Promissory Note was lost does not preclude RFR from establishing a bankruptcy claim "right to payment" (11 U.S.C. § 101(5)(a)) because RFR could "still enforce the Note even without possession." *CEI Enterprises, Inc. v. Pro. Coating Techs*., Inc., 2023 WL 6377375, at *5 (D.N.M. Sept. 29, 2023). As the Bankruptcy Court correctly explained, the UCC "specifically contemplates that a negotiable instrument may be lost and, consequently, allows the claimant to prove its claim by evidence other than the instrument itself." *In re BL Santa Fe*, 2024 WL 4174388, at *5. Section 55-3-309(a) of the New Mexico Code provides that "[a] person not in possession of an instrument is entitled to enforce the instrument if" (1) the person seeking to enforce he instrument was entitled to enforce the instrument when loss of possession occurred, (ii) the loss of possession was not due to a transfer or lawful seizure, and (iii) "the person cannot reasonably obtain possession of the instrument because … its whereabouts cannot be determined." N.M. Stat. Ann. § 55-3-309(a). Once "entitled," the person not in possession must prove "the terms of the instrument and the person's right to enforce the instrument." N.M. Stat. Ann. § 55-3-309(b).

RFR offered first-hand accounts from both the former manager of the obligor under the Promissory Note who signed the Promissory Note (Mr. Holland) and the obligee (RFR through its Co-President, Pitts). Mr. Holland confirmed he delivered the original Promissory Note to RFR, and Mr. Pitts confirmed that the original Promissory Note had been lost, not transferred or seized, and that the only copy available was a digital copy RFR maintained. (APPX.000097 at 13:4–18; APPX.000337–38 at 99:25–100:3.) As the Reorganized Debtor offered no contrary evidence, the

---

Com. Code § 3309(a). The Bankruptcy Court explained that "[e]ach state's version of § 3-309 is identical," but "[b]ecause the issues discussed herein involve a claim which arose in New Mexico, the Court will cite herein to the New Mexico statute." *In re BL Santa Fe*, 2024 WL 4174388, at *2 n.27.

Bankruptcy Court did not err in finding that "the loss of possession was not due to a transfer or lawful seizure" and that "RFR was unable to locate the Note"; thus, the predicate elements of Section 55-3-309(a) were satisfied. *In re BL Santa Fe*, 2024 WL 4174388, at *6.

Mr. Pitts and Mr. Holland further confirmed the Promissory Note's terms and RFR's right to payment. Both witnesses confirmed that they negotiated the Promissory Note, both identified the digital copy of the Promissory Note admitted into evidence as an authentic copy of the original Promissory Note, and Mr. Holland confirmed he signed the original Promissory Note, delivered it by hand to RFR's Co-President, and that the digital copy of his signature was authentic. (APPX.000958; APPX.002118; APPX.000110–11 at 26:7–27:5; APPX.000322–24 at 84:2–86:20; APPX.000327 at 89:4–19.) Moreover, both Mr. Pitts and Mr. Holland authenticated the Note Modification confirming the Promissory Note's existence, monetary terms, and payment extension to June 15, 2021, subject to the Extension Fee. (APPX.000095–96 at 11:24–12:15; APPX.000117 at 33:24–34:17; APPX.000330–31 at 92:14–93:18.) The Bankruptcy Court did not err in concluding that the authenticated copies of the Promissory Note and Note Modification, as well as sworn testimony from the principals of both documents' counterparties, were sufficient to carry RFR's burden of proving the existence and terms of the Promissory Note and RFR's right to payment.

RFR introduced further evidence of the Promissory Note's existence and terms. Mr. Pitts and Mr. Holland testified that the Promissory Note was entered to secure a "deferral" because BLSF had liquidity sufficient to pay only $730,000 of the $880,000 Loan Fee due at the June original 2019 loan closings with Fortress and Juniper. (APPX.000107 at 23:2–20; APPX.000320–21 at 82:14–83:18.) The amount due was set forth in an Invoice RFR issued to BLSF confirming $730,000 would be received at closing with the remaining $150,000 "deferred" and "secured by note in favor of Realty Financial Resources, Inc." (A.000001; APPX.000112–15 at 28:15–32:8; APPX.000320–21 at 82:14–83:18.) Consistent with the Promissory Note, BLSF wired the "$730,000 portion of your fee" to RFR

at closing, with the deferred $150,000 amount subject to a "Note," as Mr. Holland confirmed in his testimony and in a contemporaneous writing. (A.000002; APPX.001738; APPX.000329–30 at 91:19–92:7.) Mr. Holland also confirmed that the $150,000 due was recorded in BLSF's general ledger as a payable to RFR. (A.000006 ¶ 19; A.000038.) In short, there was ample evidence supporting the Bankruptcy Court's determination that RFR had a right to payment. Accordingly, the Court rejects the Reorganized Debtor's contention that there was a "lack of evidence." (D.I. 20 at 38.)

Indeed, the Reorganized Debtor offered little to rebut the validity of Claim No. 12. The Reorganized Debtor argues that the copy of the Promissory Note admitted at trial was "not clear" and that Mr. Holland's testimony concerning executing the Promissory Note and its terms was "not credible." (D.I. 20 at 38, 41.) The purpose of Section 55-3-309(a) of the New Mexico Code (and Section 3-309(a) of the UCC), however, is to enable note enforcement under these circumstances, where the payee—RFR—lacks possession of a note and must prove its terms and enforceability with extrinsic evidence.[6] RFR submitted ample extrinsic evidence to support the existence and terms of the Promissory Note and to corroborate Mr. Pitts' and Mr. Holland's related testimony, which the Bankruptcy Court determined was credible.

The Reorganized Debtor suggests that the Bankruptcy Court should have disregarded RFR's evidence based on the testimony of Mr. Wolf, who testified that "Juniper was unaware of the purported Promissory Note between RFR and [BLSF], despite Juniper being involved in the closing that allegedly involved the Promissory Note"; this testimony "call[ed] into question the legitimacy of Claim No. 12." (D.I. 20 at 39.) Whereas the central issues regarding the Promissory Note were

---

[6] *See also* Fed. R. Evid. 1004(1) ("An original is not required, and other evidence of the contents of a writing … is admissible if: (a) all the originals are lost destroyed, and not by the proponent acting in bad faith….").

whether it was entered into and its material terms, Mr. Wolf's testimony revealed his lack of any personal knowledge as to either issue.[7]  For example, when asked whether he was "involved in any negotiations as to the promissory note that is the subject of this matter today," Mr. Wolf responded, "I was not" and noted his purported surprise "to subsequently learn that Realty earned a fee on the mezzanine debt which we put into the project."  (APPX.000156 at 72:9–14.)  Mr. Wolf's lack of first-hand knowledge and purported "surprise" does not conclusively rebut Mr. Holland's and Mr. Pitts' first-hand account that the documentary evidence corroborated.  And as the Bankruptcy Court pointed out, "it is irrelevant whether Juniper or Fortress were aware of the Note at the time; it was an obligation of the Debtors which was corroborated by RFR and the Debtors' representative at the time"—i.e., Pitts and Holland.  *In re BL Santa Fe*, 2024 WL 4174388, at *6.

The Reorganized Debtor failed to offer any direct evidence refuting the Promissory Note's existence, refuting RFR's entitlement to the $880,000 Loan Fee, refuting that only $730,000 of the Loan Fee was paid at closing, or providing any reason why the parties would enter into a Note Modification if there were never a Promissory Note in the first place.  The Court finds no error in the Bankruptcy Court's determination that RFR carried its burden of establishing its right to payment based on the uncontested testimony of Pitts and Holland along with the substantial corroborative documentary evidence in allowing RFR's Claim No. 12.

---

[7] When asked whether he assisted "in drafting any agreements between the Debtors and [RFR]," Mr. Wolf responded, "I did not." (APPX.000154 at 70:19:21.) When asked whether he assisted "in negotiating the fee arrangements between the Debtors and [RFR] relating to the 2019 loans," Mr. Wolf responded, "I did not." (*Id*. at 70:22–25.) When asked whether he had "personal knowledge whatsoever of any agreements between the Debtor and [RFR] during the 2019 loans," Mr. Wolf responded, "I do not." (APPX.000155 at 71:10–13.)

2.    **The Bankruptcy Court Did Not Err in Concluding that RFR Carried its Burden Under the Bankruptcy Rules**

The Reorganized Debtor argues that "[w]ithout the original Promissory Note or a clear, executed copy of the Promissory Note, RFR failed to meet its burden under Federal Rule of Bankruptcy Procedure 3001(c)(1) for proofs of claim.  (D.I. 20 at 39 (citing Fed. R. Bankr. P. 3001(c)(1) ("If a claim or an interest in the debtor's property securing the claim is based on a writing, the creditor must file a copy with the proof of claim....")).)  While Federal Rule of Bankruptcy Procedure 3001(c)(1) recognizes an exception when "the writing has been lost or destroyed," it still requires that "a statement explaining the loss or destruction must be filed with the claim," and the Reorganized Debtor points out that RFR failed to file such a statement with Claim No. 12.  (*Id*. at 40).  The Reorganized Debtor argues that "RFR failed to comply with the basic requirements for filing its proof of claim, and this failure resulted in the loss of any presumption of *prima facie* validity for Claim No. 12."  (*Id*.)

The Reorganized Debtor is correct that, because of its failure to include "a statement explaining the loss or destruction" with its claim, RFR lost the presumption of prima facie validity under Bankruptcy Rule 3001(f), which would otherwise place the burden of production on the Reorganized Debtor to submit evidence of invalidity.  But this shortcoming did not preclude RFR from ultimately proving its claim.  *See, e.g.*, *In re Marshall*, 613 B.R. 194, 223 (Bankr. E.D. Pa. 2020) ("Although the Original Proof of Claim and Amended Proof of Claim may not have constituted *prima facie* evidence of Abdoun's claim since they did not comply with Rule 3001(c)(1)–(2), Abdoun testified at trial that his claim is based upon his purchase of the Property for $29,000 at the sheriff's sale."), *aff'd sub nom*. *Marshall v. Abdoun*, 2023 WL 2588166 (E.D. Pa. Mar. 20, 2023); *In re Walker*, 526 B.R. 187, 193 (E.D. La. 2015) ("The documentation requirements listed in Rule 3001(c) of the Bankruptcy Rules 'do[] not create an independent ground for claim disallowance because failure to

17

comply is an evidentiary defect that only deprives a claim of its prima facie validity.'" (quoting *In re MacFarland*, 462 B.R. 857, 880 (Bankr. S.D. Fla. 2011))).

As RFR correctly points out, Section 502(a) of the Bankruptcy Code deems a claim filed under Section 501(a) "allowed" if it provides "fair notice"—a "relatively low threshold." *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 544 (Bankr. D. Del. 2016) (citations omitted). A claim objection triggers Section 502(b) which requires the Bankruptcy Court to "allow" the claim unless it falls within the section's enumerated grounds, such as where it is proven "unenforceable against the debtor … under any agreement or applicable law …" 11 U.S.C. § 502(b)(1). A shortfall in strict compliance with Rule 3001 is not a Section 502(b) enumerated ground for claim rejection. *See In re Sears*, 863 F.3d 973, 979 (8th Cir. 2017). For the reasons above, the Reorganized Debtor was provided more than "fair notice." Thus, whether Claim No. 12 enjoyed prima facie validity is beside the point where, as here, a claimant supports the validity of its claim with ample evidence.

> **B.      The Bankruptcy Court Did Not Err in Allowing Claim No. 20**

The Reorganized Debtor argues that RFR is not entitled to its purported Success Fee of 1% of the debt restructured under the confirmed Plan because (i) no "Financing," as defined in the Letter Agreement, was obtained, (ii) even if it was, RFR did not solicit such "Financing," and (iii) the Letter Agreement was terminated.

> **1.      The Bankruptcy Court Did Not Err in Determining that the Plan Implementing the Restructuring Term Sheet was a "Financing"**

The Reorganized Debtor's principal challenge to the allowance of Claim No. 20 is that "RFR did not secure a "Financing," as defined under the Letter Agreement, to trigger payment. (D.I. 20 at 24.) The Reorganized Debtor asserts that a "Financing" required money to be borrowed or credit to be raised, and that the Bankruptcy Court incorrectly interpreted the defined term. Section 1 of the Letter Agreement provides in full:

18

[The Debtors] hereby retain[] RFR on an exclusive basis during the Agreement Term (as defined below) to secure a commitment or commitments (the "Financing Commitments") for *refinancing (the "Financing")*, as defined herein, for the continued redevelopment of the [Resort] .... For the purposes of this Agreement, Financing shall mean *equity or debt, in whatever form, provided in any single transaction or a combination of transactions*, including, but not limited to equity, secured or unsecured loans, secondary or subordinate financing, guarantees or other credit enhancements, mezzanine financing, bridge loans, lease or lease financing, *or any other vehicle by which borrowed money or credit is raised.*

(APPX.000346 (emphasis added).)  The Reorganized Debtor concedes that a "Financing" can be, as here, "equity or debt" that "occur[ed] in a single or combination of transactions," but the Reorganized Debtor contends that to qualify as "Financing," "money must be borrowed, or credit must be raised." (D.I. 20 at 25.)

According to the Reorganized Debtor, neither money was borrowed, nor credit was raised, when Juniper converted its debt to equity in BLSF.  (*Id.* (citing APPX.000151 at 67:15–20).)  This is supported by the Plan, the Reorganized Debtor argues, "which provides for the conveyance of 100% of the membership interests in [BLSF] to Juniper in exchange for satisfaction of Juniper's debt.  (*See* APPX.000394–000396 at Art. III.B.f-i.)  "A conversionary event—where existing debt is directly swapped for equity—is not the same as adding new value by borrowing money or raising capital.  It is simply the exercise of a remedy."  (D.I. 20 at 26.)

The Bankruptcy Court did not err in concluding that the Plan's conversion of Juniper's debt to equity was a "Financing" under the Letter Agreement.  "Equity … in whatever form" is expressly included in the Letter Agreement's definition of "Financing," with "no caveat excluding a transaction involving a debt-for-equity swap."  *In re BL Santa Fe,* 2024 WL 4174388, at *11 (citing Black's Law Dictionary (12th ed. 2024) (including "equity financing" in definition of "financing").  Nor did the Bankruptcy Court err by rejecting the argument that Juniper's equity was simply the "exercise of a remedy" through which it "in essence foreclosed its collateral."  (*See* D.I. 20 at 26, 30.)  Juniper

offered no evidence that it was entitled to force a debt-for-equity conversion under its loan agreements whereby it would be entitled to own, rather than auction, its collateral and, even if it were, Juniper never exercised that remedy.  Instead, as the Bankruptcy Court pointed out, Mr. Wolf testified that "although Juniper had scheduled a foreclosure sale, it continued that sale several times because the Blank Group threatened to overbid it at the sale, which would have precluded Juniper from obtaining the Debtors' equity that it ultimately received under the Plan.  *In re BL Santa Fe,* 2024 WL 4174388, at *10 (citing APPX.000146–49 at 62:10–65:5).

"Similarly," the Reorganized Debtor argues, "Fortress did not provide additional money or capital to the Reorganized Debtor under the confirmed Plan; instead, Fortress's debt was merely restructured."  (D.I. 20 at 26 ("Again, no conversionary event occurred.  No new value was added in the form of money or credit.").)  (*Id.*)  But like the Juniper Mezzanine Loan, the refinancing of the Fortress Senior Loan under the Restructuring Term Sheet and the Plan was "debt, in whatever form" that fell within the scope of a "Financing."  Under the Plan, the accelerated Fortress Senior Loan was "Allowed" in full and the obligation was then satisfied by "payment in accordance with the Amended and Restated Senior Loan Documents" along with a $1.1 million waiver of default interest—the new "debt" documents served as a novation of the original loan.  (APPX.000391.)  Nothing in the Letter Agreement required "debt, in whatever form" to consist of new or increased "debt" to qualify as a "Financing."  As the Bankruptcy Court explained, "[a] refinancing is commonly understood to include the amendment of the terms of existing secured debt."  *In re BL Santa Fe,* 2024 WL 4174388, at *11 (quoting Black's Law Dictionary (12th ed. 2024) (defining "refinancing" as "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan").

The Reorganized Debtor argues that the Bankruptcy Court's interpretation of the Letter Agreement erroneously ignored the Letter Agreement's qualifying language that money must be

borrowed or credit raised to qualify as a "Financing." (D.I. 20 at 28.) In its thorough analysis, the Bankruptcy Court concluded that the last phrase of section 1 ("or any other vehicle by which borrowed money or credit is raised") is merely a catchall provision designed to ensure that any examples not explicitly mentioned, but similar in nature to those mentioned, are still covered under the Letter Agreement. *See In re BL Santa Fe, LLC*, 2024 WL 4174388, at *11. As the Bankruptcy Court correctly explained, "[a] catchall provision cannot be used to eliminate the preceding items specifically listed in an agreement." *Id.* Indeed, the Court agrees with RFR that the Reorganized Debtor's interpretation would read out the provision that a "Financing" could include "equity ... in whatever form," as equity, by definition, is a direct investment and not "borrowed money or credit."

The Reorganized Debtor further argues that its interpretation is bolstered by paragraph 6 of the Letter Agreement, which provides that "[t]he Success Fee shall be payable immediately upon an actual closing from the initial proceeds with the funding of all or any portion of such Financing." (*See* D.I. 20 at 29–30 (citing APPX.000347 ¶ 6).) "In other words," the Reorganized Debtor argues, "RFR was only entitled to a Success Fee if a 'Financing' transaction actually closed and provided proceeds to [BLSF] (from which the Success Fee could be taken)." (D.I. 26 at 13–14.) Because Juniper converted its debt to equity, the Reorganized Debtor argues, there was no closing to trigger the Success Fee. (*See* D.I. 20 at 29.) Similarly, BLSF did not close with Fortress and obtain additional funds from Fortress under the Plan. According to the Reorganized Debtor, the Bankruptcy Court erred in determining that the confirmation of the Plan constituted a closing. (*Id*. a 29–30.)[8]

---

[8] RFR argues that Fortress, Juniper, and the Debtors entered into a "Restructuring Term Sheet," to be implemented through the Plan, that defined the consummation of Juniper's debt to equity as a "closing." (D.I. 24 at 43.) In its reply, the Reorganized Debtor points out that RFR never made this argument before and cannot argue it for the first time on appeal. (D.I. 26 at 14.) The Reorganized Debtor further argues that the Restructuring Term Sheet's use of "closing" does not alter the terms of the Letter Agreement between separate parties—RFR and BLSF—which required the receipt of actual "proceeds." (*Id*.) The Court will not consider an argument that was not presented to the Bankruptcy Court. *Covertech Fabricating, Inc. v. TVM Bldg. Products, Inc.,* 855 F.3d 163, 175 (3d

Although "closing" is not defined in the Letter Agreement, the "Effective Date" on which all "Transactions" were "consummated" occurred on October 21, 2021, with Fortress executing the Amended and Restated Senior Loan Documents through which "payment" was made on the Senior Loans, and with Juniper receiving a 100% ownership interest in the Reorganized Debtor and funding the "Additional Cash Contribution." (APPX.002408.)  The "Effective Date" was the "closing," as the Bankruptcy Court correctly determined.  The fact that BLSF failed to pay the Success Fee—even out of the "Additional Cash Contribution"—did not mean that no closing occurred.

More importantly, the Reorganized Debtor's arguments assume a "closing" was required for RFR to earn a Success Fee.  The Letter Agreement states that "RFR shall be entitled to receive and be deemed to have earned a success fee (the 'Success Fee')" if "a Financing Commitment is executed" by BLSF or its "parents, subsidiaries and affiliates, or assigns, direct or indirect." (APPX.000346.)  Here, BLSF executed a Financing Commitment—a "commitment or commitments … for refinancing" under the Letter Agreement—when it executed the Restructuring Term Sheet and became a proponent of the Plan in August 2021.  (APPX.000068; APPX.000367.)  At that time, RFR became "entitled to receive" and "deemed to have earned a success fee." (*Id.*)  The Letter Agreement then provided when the Success Fee became payable (upon a "closing") and how it was to be paid ("from the initial proceeds" or any "portion" thereof).  That proceeds did not exchange hands does not change the fact that the executed financing commitments with Fortress and Juniper entitled RFR "to receive and be deemed to have earned a success fee."  (*Id.*)

**2.    The Bankruptcy Court Did Not Err in Concluding that RFR was Entitled to a Success Fee Based On a Financing Commitment**

The Reorganized Debtor argues that RFR was not entitled to a Success Fee because RFR did not "solicit" a "Financing Offer" that was consummated.  (D.I. 20 at 31–32.)  Mr. Wolf, on behalf of

─────────────────────

Cir. 2017).

Juniper, testified that Mr. DeSantis, on behalf of BL Santa Fe (Holding), which wholly owned Mezz, approached Mr. Wolf regarding Juniper submitting a proposal in early 2021. (*See* APPX.000141 at 57:15–25.) Mr. Wolf testified that he was not approached by anyone from RFR. (*See* APPX.000142 at 58:1–15.)

The Bankruptcy Court rejected that argument because the Letter Agreement did not require any such direct solicitation. *In re BL Santa Fe,* 2024 WL 4174388, at *13. The Court agrees. The Letter Agreement retained RFR "on an exclusive basis during the Agreement Term" to "solicit offers for financing" and provided that RFR would "be entitled to receive and be deemed to have earned a success fee" if "a Financing Commitment is executed by Owner under a Financing Offer." (APPX.000981–82.) "Financing Commitment" was defined as "a commitment or commitments … for Financing." (APPX.000981.) "Financing Offers" were defined as "offers for financing" that "set forth the terms and conditions for a potential Financing." (*Id.*) Nothing in the Letter Agreement required RFR to have directly solicited the entities that entered a "Financing Commitment."

The Reorganized Debtor further argues that RFR was not entitled to a Success Fee because RFR's solicitation and negotiation with the Blank Group did not benefit BLSF. (*See* D.I. 20 at 32–35.) The Bankruptcy Court rejected that argument because the evidence established that RFR not only was directly involved in seeking proposals from Juniper, RFR also was closely involved in negotiating those proposals consistent with the role for which it was retained under the Letter Agreement. *In re BL Santa Fe,* 2024 WL 4174388, at *12. According to the Reorganized Debtor, "Juniper entered into the February Term Sheet before the Blank Proposal was executed in April 2021." (D.I. 20 at 31 n.9; APPX.000350–361; APPX.000362–366). "Thus, Juniper had already agreed to what was eventually consummated in the Plan before any formal offer was made by Mr. Blank." Accordingly, the Reorganized Debtor asserts, "[t]he Bankruptcy Court was incorrect that "it was not until the Debtors received the Blank [P]roposal that Juniper presented the term sheet that the

Debtors ultimately accepted and consummated." (*See* APPX.002440.)

The record shows RFR in fact "solicit[ed] offers" and engaged in "negotiations for Financing" with many potential sources of refinancing consistent with its job under the Letter Agreement, including with Blank, Fortress and Juniper. The evidence further shows that RFR participated in a kickoff telephone call with Juniper to "talk through the details" of its initial proposal, analyzed the proposal with BLSF's management and revised Juniper's proposal which led directly to Juniper's February 16, 2021 term sheet. (APPX.000207–209 at 123:25–125:23; APPX.000218 at 134:6–10; APPX.000350–61; APPX.000627–700; A.000066.) That term sheet, as further negotiated over time, became the framework for and was substantially similar to the terms incorporated in BLSF's Plan.

The evidence also showed that RFR solicited and negotiated with the Blank Group, which created "competition" and prompted Juniper to abandon its demand to be "repaid in full" and provide a competing equity offer. (APPX.000205 at 121:6–22; APPX.000207–209 at 123:25–125:23; *see* A.000064.) The "competition" was precisely the atmosphere for which BLSF's management was hoping in retaining RFR. As one of BLSF's members declared after Juniper made its initial proposal, "I am always open for a bidding war!", and he was pleased that Juniper joined the fray because of his opinion that "Juniper brings more professionalism and many more capabilities to the table that will result in a faster ramp up and sale." (APPX.000657.)

Despite RFR's generating competition which led to the ultimate "Financing," the Reorganized Debtor argues that the Bankruptcy Court should have discounted RFR's engagement with the Blank Group because the effort "did not benefit" BLSF. (D.I. 20 at 32.) The Reorganized Debtor cites Mr. Wolf's opinion that RFR did not provide any economic benefit to the Debtors. But Mr. Wolf represented the *competing* bidder, and the Reorganized Debtor did not provide any first-hand testimony on this issue from any of its prepetition principals, even though Mr. Holland testified about other matters. The Bankruptcy Court discounted Mr. Wolf's credibility as "tainted by his role with

24

Juniper at the time, whose interest was in avoiding any competition." *In re BL Santa Fe,* 2024 WL 4174388, at *13.  The Bankruptcy Court instead credited the complete "evidentiary record" which demonstrated that "RFR's efforts in analyzing and negotiating the Blank Group's proposal, rather than being detrimental to the Debtors, was beneficial and in fulfillment of its duties under the Letter Agreement." (*Id.*)  This determination was far from clear error.

### 3.    The Bankruptcy Court Did Not Err in Determining that the Letter Agreement Was Not Terminated Before the Plan Was Confirmed

The Reorganized Debtor asserts that RFR was not entitled to a Success Fee because the Letter Agreement on which it relies was terminated, effective June 1, 2021, by the letter dated October 28, 2021, from Mr. Norvet, the post-petition Reorganized Debtor's then President.  The Bankruptcy Court agreed with RFR "that the Debtors' purported termination of the Letter Agreement on October 28, 2021, was ineffective."  *In re BL Santa Fe,* 2024 WL 4174388, at *8.  The Reorganized Debtor challenges this determination on the basis that RFR "presented no evidence that the termination letter was not authentic or that a termination letter cannot have retroactive effect."  (D.I. 20 at 36.)  As RFR pointed out, other than the self-serving letter dated almost 5 months after the fact (and 7 days after RFR had filed its first proof of claim), the Reorganized Debtor produced no credible evidence that the Letter Agreement was in fact terminated effective June 1, 2021.  And "[n]otably neither Mr. Norvet (the author of the termination letter), nor any other principal of the Debtors during the time at issue, testified."  *In re BL Santa Fe,* 2024 WL 4174388, at *8 n.76.

Section 2 of the Letter Agreement provides that its term "shall be for six (6) months and shall commence on the execution date of this Agreement.  The Agreement Term shall be extended so long as RFR and BSF continue negotiations for Financing with bona fide Investors.  RFR and [BLSF] agree that each must approve a termination date (the 'Termination Date') when negotiations have concluded."  (APPX.000346 § 2.)  The Bankruptcy Court determined that "RFR presented credible,

unrebutted evidence demonstrating that negotiations with potential lenders continued beyond June 1, 2021, thereby automatically extending the term of the Letter Agreement." *In re BL Santa Fe,* 2024 WL 4174388, at *8 (citing APPX.000185–86 at 101:18–102:8, 134:11–138:14; APPX.000287–88 at 48:25–49:23.) The Reorganized Debtor presented no evidence to the contrary.

The Bankruptcy Court also found that "RFR presented credible testimony that it had not agreed to terminate the Letter Agreement." *Id.* (citing APPX.000224–230 at 140:6–146:21; APPX.000232 at 148:11–15.) The Reorganized Debtor contends that RFR's view of the Letter Agreement, as Pitts purportedly testified, was "strained" and "nonsensical" because BLSF "could never terminate the Letter Agreement unless and until there was a 'Financing Commitment' or RFR consented." (*See* D.I. 20 at 36.) "When pressed on the mechanics of RFR's interpretation of the termination clause in the [Letter] Agreement," the Reorganized Debtor argues, "Mr. Pitt's testimony made it clear that [BLSF] could never terminate the Letter Agreement unless and until there was a "Financing Commitment," meaning "RFR could force BLSF to be bound indefinitely." (*Id.* at 36.)

The Letter Agreement provides that "[t]he Agreement Term shall be extended so long as RFR and [BLSF] continue negotiations for Financing with bona fide Investors" and provides for the parties' agreement to a termination date after "negotiations have concluded." (APPX.000346 § 2.) As the Bankruptcy Court observed:

> The Agreement would have terminated on June 1 if there had not been ongoing negotiations with prospective investors on that date. It would also have terminated after all prospects had ceased negotiations, on an appropriate date that the parties selected.

*In re BL Santa Fe,* 2024 WL 4174388, at *8. Such a determination was not "draconian," as the Reorganized Debtor suggest.

But "even if the Letter Agreement had terminated on June 1, 2021, RFR would still be entitled to a Success Fee if the Debtors accepted a Financing Offer within twelve months after the Termination

Date from any party with whom RFR and the Debtors had been negotiating prior to termination."  *Id*. under section 9 of the Letter Agreement,[9] RFR is entitled to a Success Fee even after termination of the Letter Agreement if a financing offer from any of the parties with whom the Debtors were in discussions at the time of the termination is accepted by the Debtors.  "On receiving the termination letter, Mr. Pitts sent an email disputing the termination and attaching a Prospects List as required under section 9.[10]  *Id*.  "The Prospects List included both Fortress and Juniper, the two lenders that ultimately provided financing when the Debtors' Chapter 11 Plan was consummated in October, 2021 (well within the 12 months provided in section 9)."  *Id*.  "There is no dispute that the Debtors, with RFR's assistance, had been in negotiations with Juniper and Fortress prior to June 1, 2021, and that the Debtors had accepted and consummated a deal with both of them when the Debtors' Plan was confirmed on October 21, 2021."  *Id*.  The record and plain language of the Letter Agreement support the Bankruptcy Court's conclusions, and the Reorganized Debtor has established no basis to disturb the Order.

---

[9] Section 9 of the Letter Agreement provides:

> Within thirty (30) days after the Termination Date or upon an earlier date selected by RFR, RFR shall furnish to [the Debtors] a list setting forth the names of all parties with whom RFR has had substantive discussions for Financing prior to the Expiration Date for the Property (the "Prospects List"). In the event that [the Debtors] shall within twelve (12) months after the Termination Date (the "Tail Period") accept a Financing Offer from any party on the Prospects List, such Financing Offer shall be deemed to have been executed prior to the Termination Date and all the provisions of this Agreement shall be applicable thereto as if the Termination had not occurred. RFR shall be entitled to any and all Success Fee(s) due under this Agreement, which shall be payable in full upon demand.

[10] While the Reorganized Debtor raises the concern that RFR hypothetically could have listed any party on the Prospects List, "regardless of whether it aided in securing financing from that party, and [BLSF] has no recourse," the evidence supported a finding that RFR had "aided in secured financing" from Juniper and Fortress.  (D.I. 20 at 37.)

**V.    CONCLUSION**

For the reasons above, the Order will be affirmed.  The Court will issue a separate Order consistent with this Opinion.